T.C. Memo. 2001-22


UNITED STATES TAX COURT


ROBERT L. STAHL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 8423-98.                    Filed January 31, 2001.


P deducted amounts for alimony paid and an additional personal exemption.  P omitted from income a distribution from the trustee of an employee plan.
    1.  <u>Held</u>:  P has shown his entitlement to only a portion of the alimony deduction taken.
    2.  <u>Held</u>, <u>further</u>, P has not shown his entitlement to the additional personal exemption.
    3.  <u>Held</u>, <u>further</u>, P must include in income the distribution from the trustee.


Robert L. Stahl, pro se.

<u>Michael C. Prindible</u> and <u>Audrey M. Morris</u>, for respondent.

MEMORANDUM OPINION

HALPERN, Judge: By notice of deficiency dated February 18, 1998 (the notice), respondent determined deficiencies in petitioner's 1994 and 1995 Federal income taxes of $2,569 and $12,390, respectively.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issues for decision concern (1) petitioner's deductions for (A) alimony paid and (B) an additional personal exemption and (2) petitioner's omission from gross income of an amount received from Vanguard Fiduciary Trust Co.

Some facts have been stipulated and are so found. The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference. We need find few facts in addition to those stipulated and shall not, therefore, separately set forth our findings of fact. We shall make additional findings of fact as we proceed. Petitioner bears the burden of proof. See Rule 142(a).

## Background

At the time the petition was filed, petitioner resided in Australia.

Petitioner married Gabrielle Hodson on January 16, 1990. One child, Meagan Elizabeth Stahl (sometimes, Meagan), was born of that union, on September 20, 1991.  Meagan is a child with special needs, who requires close and personal care from her mother.  On May 12, 1994, Ms. Hodson filed for divorce in the Circuit Court of the Sixth Judicial Circuit, in and for Pinellas County, State of Florida (the divorce case and the State Court, respectively).

On August 18, 1995, the State Court entered its "Supplemental Final Judgment of Dissolution of Marriage" (the supplemental final judgment) in the divorce case.[1]  Among the findings of fact and orders made by the State Court in the supplemental final judgment are the following:

> 2.  Shortly  after the Former Wife filed her Petition for Dissolution of Marriage, the Former Wife moved for and the Court granted an Ex Parte Injunction in which the Former Wife was awarded temporary exclusive possession of a BMW automobile and residence and froze certain assets of the parties.  In response to the Former Wife filing for dissolution of the marriage and serving the Former Husband, the Former Husband quit his $60,000.00 per year job in Pinellas County with E-Systems.  He claimed that the injunction freezing assets caused him to have to move to family in Indiana and give up his job in Pinellas County.

> 3.  On May 26, 1994, the Former Wife's counsel filed an Amended Motion for Temporary Fees, Support and Exclusive Use and Possession of the Marital Home.  The

---

[1]  Previously, on May 17, 1995, the State Court had entered its "Final Judgment of Dissolution of Marriage" (final judgment). The supplemental final judgment repeated many of the findings made in the final judgment.

Former Wife's counsel did not call this motion up for hearing until June 23, 1994, at which time the Court removed the freeze on certain assets and temporarily made certain assets available to the parties for use to sustain them on an interim basis [by an order filed on July 1, 1994 (the July 1, 1994, order)].  The Former Wife's counsel did not bring on for hearing the temporary support motion until August 18, 1994, at which time the Court ordered unallocated child support and alimony in the amount of $2500 per month, with the first payment to be made on August 19, 1994.  The Order Setting Unallocated Child Support and Alimony is dated September 8, 1994, nunc pro tunc to August 18, 1994 [(the September 8, 1994, order)].  This order provided for disposition of certain assets to fund the temporary unallocated child support and alimony based upon Mr. Stahl's voluntary relinquishment of his $60,000 per year job at E-Systems.[2]

4.  On March 29, 1995, the Court heard the Former Wife's Motion for Order of Contempt in which the Former Wife proved that the Former Husband had not paid the unallocated child support or alimony as previously ordered.  The Court found that the Former Husband, Robert L. Stahl, willfully violated the Order of this Court dated September 8, 1994 and refused to pay the child support or pay to or on behalf of the Former Wife the Hughes IRA account and other assets so as to pay the unallocated child support and alimony.  The Court further ordered that Robert L. Stahl be committed to the Pinellas County Jail for a period of 90 days or until such time as he purges himself from willful contempt of court.  The Court found that Robert L. Stahl had the ability to purge the contempt and otherwise provided for the release from the County Jail on the payment of the purged amount.

5.  Although the Former Husband presently resides in Dallas, Texas, and the Court cannot extradite the Former Husband from Texas for incarceration on a civil contempt order, Robert L. Stahl voluntarily presented himself to the Pinellas County Jail and requested

---

[2]  The Sept. 8, 1994, order required that the proceeds from the assets disposed of were to be paid to Ms. Hodson's attorney, Roxann D. Seeley, who was to pay out to Ms. Hodson the $2,500 a month ordered as unallocated child support and alimony.

incarceration on the contempt order on Wednesday, May 3, 1995, five days before the non-jury trial. Robert L. Stahl appeared at the non-jury trial of this cause in custody of the Pinellas County Sheriff on the previously entered contempt and commitment order entered by this Court for the failure to pay child support. It is this Court's interpretation of the Former Husband's actions that he is willing to take any action including voluntarily going to jail to avoid his obligations to his family and his disabled child.

* * * * * * *

7. Notwithstanding the Former Husband's voluntary abandonment of his $60,000 per year job at E-Systems and the voluntary dissipation of assets available to pay child support and alimony pending the Final Hearing, the Former Husband has made it clear that he has no intentions of paying any support as Ordered by this Court or complying with lawful Judgments of this Court. He has dissipated or hidden every asset which he could control since the pendency of this action.

8. Until the hearing of June 29, 1995, the Former Wife had been unable and prohibited by the Former Husband from discovering the value of the Former Husband's pension and profit-sharing benefits at his former employer.

9. At this time the Former Wife is unable to be employed outside of the home because of the attention required by the parties' disabled child. She, however, is seeking to become employed in the future and is currently seeking employment. In the interim, because the Former Husband has refused to pay child support, although having the ability to do so, the Former Wife is presently on public assistance through the receipt of AFDC. * * * The Former Husband's child support obligation, commencing June 1, 1995, shall be * * * $1234.25 per month

* * * * * * *

10. The Court has previously entered a qualified Domestic Relations Order (QDRO) as to the Former Husband's Capital Accumulation Plan (T-CAP). The Court's Order was dated November 10, 1994. That Order is hereby set aside and shall have no force and effect.

The Court has also previously Ordered, in its Final Judgment dated May 17, 1995, that a QDRO be issued to E-Systems in the amount of $22,500 for unallocated support.  That section of said Final Judgment is hereby amended in that, pursuant to the Stipulation of the parties, the Wife shall receive the amount of $55,400 from the Former Husband's Capital Accumulation Plan (T-CAP) or from the Former Husband's ESOP, whichever is appropriate, for which a QDRO shall issue in full settlement of the back child support ($22,500 as previously Ordered by the Court in its Final Judgment dated May 17, 1995) and the remainder ($32,900) as other equitable distribution.

Therefore, a single QDRO shall be ordered, in the amount of $55,400, of which $22,500 is for a child support obligation and $32,900 is for equitable distribution pursuant to the parties agreement of June 29, 1995.

The Wife's claim for unallocated alimony is merged into this Supplemental Final Judgment thus rendering any claim for alimony <u>pendente lite</u> moot and unenforceable.

> \*    \*    \*    \*    \*    \*    \*

14.   The Court had previously awarded the Former Wife the amount of $500 per month, for six months, as and for alimony.  An Income Deduction Order (IDO) shall be issued to secure payment of said alimony.  Until such time as said IDO is entered, the Former Husband shall pay said sums directly to Former Wife, beginning August 1, 1995, and continuing until paid in full.
\* \* \*

> \*    \*    \*    \*    \*    \*    \*

NOW, THEREFORE, IT IS ORDERED AND ADJUDGED that:

1.   The marriage of the parties is irretrievably broken and that the bonds of matrimony between the Former Wife, Gabrielle Hodson, and Respondent, Robert L. Stahl, are dissolved, effective May 17, 1995.

2.   The parties shall share parental responsibility of the minor child of the parties, Meagan Elizabeth Stahl.  However, there shall be no

visitation, contact or access between Robert L. Stahl and the minor child until Robert L. Stahl proves to the Court, via evidence and expert testimony, that it is in the best interests of the child that he have contact, access and visitation with the minor child.  Any such visitation will require a further Order of the Court.

             *    *    *    *    *    *    *

5.   The Former husband is Ordered to pay the Former Wife six months of non-modifiable alimony payments enforceable by contempt, at $500 per month, via Income Deduction Order (IDO),  * * *  beginning August 1, 1995, as and for rehabilitative alimony.

             *    *    *    *    *    *    *

7.   The Court's previously ordered Qualified Domestic Relations Order (QDRO) as to the Former Husband's Capital Accumulation Plan (T-CAP), dated November 10, 1994, is hereby set aside and shall have no force and effect.

In substitution thereof, pursuant to the Stipulation of the parties on June 29, 1995, the Former Wife shall receive a total amount of $55,400 from the Former Husband's Capital Accumulation Plan (T-CAP) or from the Former Husband's ESOP, whichever is appropriate for which a QDRO shall issue in full settlement of the back child support ($22,500 as previously Ordered by the Court in its Final Judgment dated May 17, 1995) and the remainder ($32,900) as other equitable distribution.

Therefore, a single QDRO is hereby Ordered to be entered against E-Systems and the account of the Former Husband therein, of which $22,500 is for a child support obligation and $32,900 is for equitable distribution.  The QDRO shall be entered in the total amount of $55,400 as defined above.

             *    *    *    *    *    *    *

10.  The Court retains jurisdiction * * * to enter the required QDRO * * *

During 1995, and in accordance with the supplemental final judgment, petitioner paid Ms. Hodson $3,000 in cash.

By check dated December 21, 1995 (the check), Vanguard Fiduciary Trust Co. (Vanguard) paid $23,192.18 to the order of Meagan Elizabeth Stahl. The check states: "E-Systems, Inc.", "Disbursement Account", and "Plan Number 091184". For 1995, Vanguard issued a Form 1099R, "Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc.", to petitioner,[3] showing a gross distribution from account number 091184 of $23,192.18 (the Vanguard distribution).

On petitioner's 1994 U.S. Individual Income Tax Return, Form 1040 (1994 Form 1040), he deducted $20,000 for alimony paid. On his 1995 U.S. Individual Income Tax Return, Form 1040 (1995 Form 1040), he deducted $15,500 for alimony paid. He also showed Meagan as his daughter and dependent and, on account thereof, deducted $2,500 as a personal exemption deduction. He failed to include as an item of gross income the Vanguard distribution.

In the notice, respondent adjusted petitioner's income for both years by disallowing the claimed deductions for alimony paid. For 1995, respondent further adjusted petitioner's income

---

[3] On the Form 1099R, the recipient's name is shown as "R.L. Stahl". The recipient's "identification number" is identical to petitioner's Social Security number. We, therefore, find that Vanguard intended to name petitioner as recipient of the Form 1099R.

by disallowing the personal exemption deduction and including the Vanguard distribution.  Petitioner challenges each of those adjustments.

Discussion

I.  <u>The Deduction for Alimony</u>

Generally, payments of alimony are deductible to the paying spouse (here, petitioner) and includable in income by the recipient spouse (here, Ms. Hodson).  See secs. 71, 215.  In pertinent part, section 215 provides:

> SEC. 215.  ALIMONY, ETC., PAYMENTS.
>
> (a)  General Rule. – In the case of an individual, there shall be allowed as a deduction an amount equal to the alimony or separate maintenance payments paid during such individual's taxable year.
>
> (b)  Alimony or separate maintenance payments defined. – For purposes of this section, the term "alimony or separate maintenance payment" means any alimony or separate maintenance payment (as defined in section 71(b)) which is includable in the gross income of the recipient under section 71.

Section 71(a) provides:  "Gross income includes amounts received as alimony or separate maintenance payments."  In pertinent part, section 71(b) and (c) provides:

> SEC. 71.  ALIMONY AND SEPARATE MAINTENANCE PAYMENTS
>
> (b)  <u>Alimony or separate maintenance payments defined</u>.-- For purposes of this section--
>
> > (1)  In general.--The term "alimony or separate maintenance payment" means any payment in cash if --

(A) such payment is received by (or on behalf of) a spouse under a divorce or separation instrument,

(B) the divorce or separation instrument does not designate such payment as a payment which is not includible in gross income under this section and not allowable as a deduction under section 215,

(C) in the case of an individual legally separated from his spouse under a decree of divorce or of separate maintenance, the payee spouse and the payer spouse are not members of the same household at the time such payment is made, and

(D) there is no liability to make any such payment for any period after the death of the payee spouse, and there is no liability to make any payment (in cash or property) as a substitute for such payments after the death of the payee spouse.

(2) Divorce or Separation instrument.--The term "divorce or separation instrument" means --

(A) a decree of divorce or separate maintenance or a written instrument incident to such a decree,

(B) a written separation agreement, or

(C) a decree (not described in subparagraph (A)) requiring a spouse to make payments for the support or maintenance of the other spouse.

(c) Payments To Support Children.--

(1) In general.--Subsection (a) shall not apply to that part of any payment which the terms of the divorce or separation instrument fix (in terms of an amount of money or a part of the payment) as a sum which is payable for the support of children of the payer spouse.

* * * * * * *

(3) Special Rule Where Payment Is Less Than Amount Specified In Instrument.--For purposes of this subsection, if any payment is less than the amount specified in the instrument, then so much of such payment as does not exceed the sum payable for support shall be considered a payment for such support.

II. 1994 Adjustment

A. Introduction

Petitioner argues: "As ordered by the * * * [State Court], alimony was paid in the amount of $2,500.00 per month for June through December of 1994 and for January through May of 1995".[4] Respondent makes numerous arguments in response. Respondent's principal argument is: "At no time did the petitioner attempt to reconcile his alimony deduction with any actual payments (in cash) nor did he attempt to allocate the $2,500 payments between child support and alimony."

---

[4] At trial, petitioner testified that he computed his deduction for alimony paid during 1994 ($20,000) on the basis of 8 monthly payments of $2,500 from May through December. That computation is consistent with finding number three in the supplemental final judgment that, on May 26, 1994, Ms. Hodson's counsel moved for, among other things, temporary support, although that motion did not come on for hearing until Aug. 18, 1994, and was not subject to an order until Sept. 8, 1994. Indeed, respondent argues that petitioner computed his 1994 deduction for alimony paid simply by multiplying the number of months (8) during 1994 for which he was required to pay $2,500 by that sum to arrive at the $20,000 deduction claimed. Respondent does not concede that any such payments were made. We shall consider petitioner's argument to be that he made such payments for May through December 1994.

B.  Discussion

The State Court ordered support for Ms. Hodson and Meagan by the September 8, 1994, order.  In the preamble to that order, the State Court found that Ms. Hodson and Meagan were in need of support of $2,500 a month.  The court also found that, since petitioner did not have the ability to provide that amount from earnings, it was necessary to liquidate assets of the parties (to the divorce case).  The court ordered the liquidation of various assets and the payment of proceeds to Ms. Hodson's attorney, to be held in trust for the benefit of Ms. Hodson and Meagan.  Ms. Hodson's attorney was ordered to pay out $2,500 a month (the $2,500 payments).

During his testimony in this case, petitioner conceded that he had no evidence that the $2,500 payments were made.  His argument, as expressed on brief, is as follows:

> These payments were made in cash through the petitioner's former wife's attorneys, officers of the court, by said attorneys liquidating certain assets of the petitioner and making periodic payments and by direct payment from the petitioner and through pay role deduction.  The assets liquidated have been summarized for the court and monies paid in alimony far exceed the deduction taken by the petitioner.  These assets were not distributed by any other means and a finding that they were not paid in alimony would return ownership of these assets to the petitioner.  Additionally, since collection for alimony was the only authority to liquidate these assets, the officer of the court executing these liquidations may have defrauded the United States government and AAL [no definition of the term "AAL" appears in the record].

The Florida court did find the petitioner in contempt for failure to provide one [sic] the assets ordered to be liquidated while accepting that the other assets were surrendered as ordered. The court did provide an order stating the alimony payments were not made but later reversed this finding after being provided with the same information provided to this court. * * *

Petitioner's argument that assets were liquidated in compliance with the September 8, 1994, order is completely at odds with findings made by the State Court in the supplemental final judgment. Among those findings are the following:

(1) The Court found that the Former Husband, Robert L. Stahl, willfully violated the Order of this Court dated September 8, 1994 and refused to pay the child support or pay to or on behalf of the Former Wife the Hughes IRA account and other assets so as to pay the unallocated child support and alimony. * * *

(2) It is this Court's interpretation of the Former Husband's actions that he is willing to take any action including voluntarily going to jail to avoid his obligations to his family and his disabled child.

(3) [T]he Former Husband has made it clear that he has no intentions of paying any support as Ordered by this Court or complying with lawful Judgments of this Court. He has dissipated or hidden every asset which he could control since the pendency of this action.

There is no evidence that, as claimed by petitioner, the State Court reversed its finding that alimony payments were not made. Moreover, there is no evidence to support petitioner's calumnious claim that Ms. Hobson's attorney defalcated. Petitioner was not a credible witness. Petitioner has failed to prove that, during 1994 (or 1995), in compliance with the September 8, 1994, order, any proceeds from a liquidation of his

assets were paid over to Ms. Hodson's attorney, or were used by that attorney to make $2,500 payments to or on behalf of Ms. Hodson or Meagan. Petitioner has failed to prove that, during 1994, he made any of the monthly payments required by the September 8, 1994, order.

In addition to claiming that he made the monthly payments required by the September 8, 1994, order, petitioner claims that the State Court, in the July 1, 1994, order, ordered him to pay alimony, which, indeed, he did pay. By the July 1, 1994, order, the State Court lifted the freeze it had imposed on certain assets (which it described as "the parties' assets"). It ordered certain sums from those assets paid to Ms. Hodson. Among those assets was an account with the MacDill Federal Credit Union, which the Court found to have an approximate balance of $2,166.15. It also ordered:

> [T]he Wife is to receive from the Husband's non-marital assets and his share of marital assets, the approximate sum of $5,205.00, which sum shall be comprised of the following approximate amounts:
>
>     (a) $900.00 – Husband's share of U.S. Savings Bonds which are marital property;
>
>     (b) $1,800 – Husband's separate U.S. Savings Bonds;
>
>     (c) $600 – Husband's one-half (1/2) 1993 IRS tax refund;
>
>     (d) $250.00 – Husband's one-half (1/2) of returned bail money.

(e)  $1,000.00 – from the MacDill Credit Union; and,

(f)  $655.00 – cash from Husband.

It is unclear what the State Court meant by "the parties' assets".  To the extent Ms. Hodson received payments from assets in which she had an ownership interest, those payments, to the extent liquidating that interest, were not alimony to her.  See Jaffe v. Commissioner, T.C. Memo. 1999-196.  Petitioner has failed to convince us that he complied with the July 1, 1994, order other than that Ms. Hodson received $2,125.73 from the MacDill Federal Credit Union.  Petitioner has failed to convince us that his interest in that account was more than $1,000.  To that extent, however, we find that he paid alimony to Ms. Hodson during 1994.

C.  Conclusion

Petitioner is entitled to a deduction for alimony paid during 1994 of $1,000.

III.  1995 Adjustments

A.  Alimony

Petitioner claims that, during 1995, pursuant to the September 8, 1994, order, he made five monthly payments of alimony (from January through May), each in the amount of $2,500. For the same reasons as with respect to 1994, petitioner has failed to prove that, during 1995, he made any of the monthly payments required by the September 8, 1994, order.

The parties have stipulated that, during 1995, and in accordance with the supplemental final judgment, petitioner paid Ms. Hodson $3,000 in cash. On brief, respondent concedes that, on account of such payment, petitioner is entitled to a deduction for alimony paid in 1995 of $3,000. We accept such concession.

Petitioner is entitled to a deduction for alimony paid during 1995 of $3,000.

### B. Personal Exemption Deduction

On petitioner's 1995 return, he showed Meagan as his daughter and dependent and, on account thereof, deducted $2,500 as a personal exemption deduction.

Section 151(a) allows a deduction for certain exemption amounts, including the exemption amount ($2,500 for 1995) for certain dependents of the taxpayer. See sec. 151(c). As applicable to this case, the term "dependent" means a daughter of the taxpayer, over half of whose support for the year is provided by the taxpayer. See sec. 152(a)(1). Generally, if a child's parents are divorced, the child is in the custody of one or both for the year, and the parents provide more than half of the child's support, the custodial parent (the parent with custody for the greater portion of the year) is treated as having provided over half of the child's support for the year, and he or she may deduct the exemption amount with respect to such child for the year. See sec. 151(e). Section 1.152-4(b), Income Tax

Regs., provides: "In the event of so-called 'split' custody, * * * 'custody' will be deemed to be with the parent who, as between both parents, has the physical custody of the child for the greater portion of the calendar year."

Petitioner failed to prove that, during 1995, Meagan received over half of her support from one or both of her parents. Even if we were to assume that she did, however, petitioner failed to prove that, as between him and Ms. Hodson, he had physical custody of her for the greater portion of the year.[5]

Petitioner is not entitled to a deduction for the exemption amount with respect to Meagan for 1995.

C.  Vanguard Distribution

Petitioner failed to report the Vanguard distribution ($23,192.18) as an item of gross income on the 1995 Form 1040. By the supplemental final judgment, the State Court found that petitioner and Ms. Hodson had stipulated (the stipulation) that Ms. Hodson would receive "the amount of $55,400 from * * * [petitioner's] Capital Accumulation Plan (T-CAP) or from * * * [his] ESOP, whichever is appropriate, * * * in full settlement of

---

[5]  Sec. 152(e)(2) provides a means by which the custodial parent may permit the noncustodial parent to claim the child as a dependent for the year. However, petitioner does not claim that Ms. Hodson signed a written declaration that she would not claim Meagan as a dependent on her return, nor is there evidence that he attached any such written declaration to his return as required by sec. 152(e)(2).

the back child support ($22,500 as previously Ordered by the Court * * * ) and the remainder ($32,900) as other equitable distribution." The State Court stated its intent to enter a QDRO against E-Systems (petitioner's employer) "and the account of * * * [petitioner] therein, of which $22,500 is for a child support obligation and $32,900 is for equitable distribution."

We think that the following are fair inferences to be drawn from the (1) supplemental final judgment, (2) check, in the amount of $23,192.18, payable to Meagan, and (3) Form 1099R, received by petitioner and evidencing the Vanguard distribution: The Vanguard distribution was from either the T-Cap or ESOP, both of which were employer-sponsored benefit plans in which petitioner was a participant on whose behalf an account was maintained; the Vanguard distribution was made pursuant to the stipulation of petitioner and Ms. Hodson that she would receive $55,400 from those accounts ($32,900 as an equitable distribution and $22,500 (plus interest) in satisfaction of petitioner's child support obligation); the Vanguard distribution liquidated petitioner's obligation pursuant to the stipulation to pay overdue child support. We find accordingly.

The parties appear to agree that the Vanguard distribution was from a tax-exempt employees' trust described in section 401(a) (an employees' trust), and, therefore, the taxability of such distribution is determined under section 402. Section

402(a) provides, with detail not here relevant, that, unless otherwise provided in section 402, distributions by any employees' trust are taxable to the distributee.  We have held that the distributee of a distribution from an employees' trust ordinarily is the participant or beneficiary (in or of the plan under which the employees' trust was established) who is entitled to receive the distribution.  See Darby v. Commissioner, 97 T.C. 51, 58 (1991) ("In particular, the mere fact that the distribution is made by the plan administrator to A rather than to B does not make A the distributee.").  Nevertheless, section 402(e)(1)(A) provides:

> (A)  Alternate Payee Treated as Distributee.--For purposes of subsection (a) and section 72, an alternate payee who is the spouse or former spouse of the participant shall be treated as the distributee of any distribution or payment made to the alternate payee under a qualified domestic relations order (as defined in section 414(p)).

Section 414(p) contains detailed specifications for a QDRO.  We need not set forth those specifications.

Pursuant to section 402(e)(1)(A), petitioner can escape taxation on the $23,192.18 distribution only if it were made to petitioner's spouse or former spouse.  The supplemental final judgment provided that Meagan was to receive $22,500 from one of petitioner's two pension plans, and, in fact, she did subsequently receive a distribution from one of petitioner's pension plans pursuant to that supplemental final judgment.

Meagan is petitioner's child, not his spouse or former spouse; therefore, even if the supplemental final judgment satisfied the requirements for a QDRO, petitioner is the distributee and subject to tax on the $23,192.18. If the supplemental final judgment is not a valid QDRO, petitioner is the distributee for purposes of section 402(a) and is subject to tax on the amount distributed. Hawkins v. Commissioner, 102 T.C. 61, 77 (1994); Karem v. Commissioner, 100 T.C. 521, 531 (1993) .

Moreover, in the supplemental final judgment, the State Court states that a QDRO "shall issue" and "a single QDRO is hereby Ordered to be entered against E-Systems and the account of the Former Husband therein". In order paragraph number 10 of the supplemental final judgment, the court retains jurisdiction: "to enter the required QDRO". We assume that the State Court intended an additional and separate order to implement its intent to issue a QDRO. Petitioner has, however, failed to show that such order was entered or, if entered, met the specifications of section 414(p). Clearly, petitioner is aware of the importance of a QDRO in establishing Ms. Hodson as an alternate payee for purposes of section 402(e)(1)(A), since he has proposed that we find that the Vanguard distribution "was made via a Qualified Domestic Relations Order". Petitioner has not claimed any difficulty in obtaining a copy of any QDRO entered by the State Court. We infer that, since no such order is in evidence, either

no such order was entered or, if entered, did not meet the specifications of section 414(p).  See <u>Wichita Terminal Elevator Co. v. Commissioner</u>, 6 T.C. 1158, 1165 (1946) ("the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable"), affd. 162 F.2d 513 (10th Cir. 1947).

We find that the Vanguard distribution is taxable to petitioner, as distributee, under section 402(a).  Because the Vanguard distribution was made in satisfaction of petitioner's obligation to pay overdue child support, it does not give rise to a deduction for alimony paid.  See sec. 71(c).

IV.  <u>Conclusion</u>

We sustain respondent's determination of a deficiency except to the extent that petitioner paid alimony to Ms. Hodson of $1,000 in 1994 and $3,000 in 1995.

<u>Decision will be entered under Rule 155</u>.